NOTICE

Decision filed 07/27/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260200-U

NO. 5-26-0200

IN THE

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| DAVID WILLIAMS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellant, | ) | Macon County. |
| | ) | |
| v. | ) | No. 21-F-265 |
| | ) | |
| TRACI KLUTTS, | ) | Honorable |
| | ) | Rodney S. Forbes, |
| Respondent-Appellee. | ) | Judge, presiding. |

JUSTICE SHOLAR delivered the judgment of the court.
Justices Vaughan and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Where a petition for allocation of parental responsibilities remained pending for over four years, the trial court did not abuse its discretion in declining to grant Father a continuance once the matter reached the trial stage. The trial court's allocations of parental responsibility for decision-making and parenting time were not against the manifest weight of the evidence where substantial evidence showed that Father was interfering with Mother's relationship with the child.

¶ 2    The petitioner, David Williams (Father), appeals an order of the circuit court of Macon County allocating parental responsibilities and parenting time between himself and the respondent, Traci Klutts (Mother). Father argues that the trial court erred in (1) denying his request for a continuance; (2) allocating sole decision-making responsibilities in the areas of education, medical care, and extracurricular activities to Mother; and (3) allocating equal parenting time to both parties. For the reasons that follow, we affirm.

1

¶ 3                                    I. BACKGROUND

¶ 4      The parties' daughter, Paisley, was born in late September 2021. She was taken into protective care by the Department of Children and Family Services (DCFS) shortly after birth due to the presence of drugs in her system, and a juvenile court case was opened. Soon after the juvenile court case opened, Paisley was released to Father's physical custody with the stipulation that he continue to reside with his mother. However, DCFS retained guardianship. See *In re Paisley W.*, 2022 IL App (5th) 220208-U, ¶¶ 4, 9-11. The case closed in August 2022.

¶ 5      On November 3, 2021, Father filed the petition to allocate parental responsibilities at issue in this appeal. In it, he alleged that he was Paisley's biological father and that he had signed a voluntary acknowledgment of paternity. He further alleged that Paisley was born with methamphetamine in her system. Father requested sole parental responsibilities for significant decision-making and the majority of parenting time. On the same date, he filed a petition for temporary relief, containing the same allegations and requesting the same relief during the pendency of the action.

¶ 6      On September 15, 2022, Mother filed a petition to determine the existence of a father and child relationship and to establish parenting time, parental responsibilities for decision-making, and child support. She requested the majority of parenting time, sole decision-making responsibilities, and child support. On the same date, Mother filed a petition for temporary relief.

¶ 7      On September 20, 2022, Father filed a *pro se* petition for an order of protection against Mother in Macon County case No. 22-OP-652. He requested that Paisley be a protected person under the order. An emergency order of protection was granted after an *ex parte* hearing. However, the matter never came for a contested hearing on Father's request for a plenary order. The order of

protection case was consolidated into the present case. After several continuances, the petition for an order of protection was dismissed by agreement of the parties.

¶ 8    On November 28, 2022, Father filed an emergency petition for temporary relief. He alleged that Mother's "behavior is detrimental and not in the best interests of the minor child," but did not include allegations of specific incidents. Father again requested sole decision-making responsibilities and the majority of parenting time. In addition, he requested that Mother's parenting time be supervised and that Mother be ordered to submit to drug tests.

¶ 9    On December 9, 2022, the parties appeared for a hearing. The trial court's docket sheet indicates that the parties agreed to a temporary order, the terms of which were recited in open court. The trial court entered a written agreed temporary order containing the parties' agreed terms on January 5, 2023. Pursuant to the agreed order, the majority of parenting time was allocated to Father, and Mother was allocated specified periods of parenting time to be supervised by her mother, Janene Greer. All parenting time was to take place within Macon County unless agreed to in writing by the parties. Both parties were ordered to submit to a hair follicle drug screen and to provide the results to the other party. In addition, both parties were ordered to communicate with each other regarding the well-being of the child by telephone or video. Father was ordered to continue to reside with his mother.

¶ 10    On August 1, 2023, Father filed another *pro se* petition for an order of protection against Mother in Macon County case No. 23-OP-588. This time, his request for an emergency order of protection was denied. The matter was consolidated with this case. Eventually, the petition for an order of protection was dismissed by agreement of the parties.

¶ 11    On February 16, 2024, Mother filed a petition for rule to show cause, alleging that Father violated the agreed temporary order by (1) refusing to allow Mother or Greer to pick up Paisley

3

for parenting time on numerous occasions, (2) taking Paisley out of Macon County without prior written agreement, and (3) refusing to answer or return phone calls and requests for video calls.

¶ 12    On February 20, 2024, the trial court entered an order for rule to show cause. It set the matter for a hearing on Mother's petition on March 8, 2024. The trial court's docket sheet indicates that when the cause came for the scheduled hearing on that date, the parties agreed to continue the matter. They further agreed to the appointment of a guardian *ad litem* (GAL) for the child. The court subsequently appointed Mark Morthland to act as GAL.

¶ 13    On March 21, 2024, Father filed a petition to modify the agreed temporary order. He alleged that Mother continued to use drugs as he observed track marks on her arms and drug paraphernalia in her vehicle. He further alleged that in September 2023, Mother "drove off with the child *** and withheld the child from Father" for three days with the assistance of her mother, Greer. He requested that the trial court modify the order to change the parenting time supervisor and to require Mother to submit to drug testing.

¶ 14    In June 2024, Mother gave birth to another daughter. That child was also removed from Mother's care due to Mother's drug use. Initially, Father was identified as a putative father of the younger child; however, it was later determined that he was not her father. The case was closed and the child was returned to Mother's care within a few months.

¶ 15    At an August 5, 2024, status hearing, Mother was given 14 days to file an amended petition for contempt, and the matter was set for a September 27, 2024, hearing on that petition as well as Father's petition to modify the agreed temporary order.

¶ 16    On August 14, 2024, Mother filed a petition for adjudication of abuse of parenting time. She alleged that Father had "wholly failed and refused to allow [Mother] to have any parenting time *** since July of 2023." She further alleged that she repeatedly asked Father to comply with

4

the agreed temporary order. Mother requested that the trial court hold Father in contempt, order him to attend an intensive parental education program (see 750 ILCS 5/607.5(c)(2) (West 2022)), allocate "significant make-up parenting time" to Mother, and order Father to pay Mother's attorney fees and costs incurred as a result of the petition for adjudication of abuse of parenting time.

¶ 17 On August 29, 2024, the GAL filed his initial report. He stated that at that time, Mother was unemployed and was living with her mother. He further noted that Mother successfully completed a drug rehabilitation program on July 31, 2024, and was in compliance with out-patient care directions. The GAL stated Father was living in a home owned by Crossing Healthcare and working full-time for Rhodes Construction, a position he had held for two years. He noted that although both parents suffered from addiction, Father had maintained his sobriety for a longer period of time than Mother.

¶ 18 The report indicated that Father was then providing all of Paisley's care. However, the GAL opined that it was appropriate to allocate some parenting time to Mother, "which would gradually be expanded." He further opined that restrictions on Mother's parenting time were necessary because of her drug use. The GAL recommended that the trial court allocate the majority of parenting time to Father and that Mother's parenting time be supervised "for now" due to her recent drug use. However, he stated that her parenting time could be expanded over time based on her success in substance abuse treatment. The GAL further recommended that Father have sole decision-making responsibilities in all areas, but this allocation could change if Mother successfully completed treatment.

¶ 19 On September 20, 2024, Mother filed a petition for indirect civil contempt. She incorporated the allegations of her previously filed petition for adjudication of abuse of parenting

5

time. She further alleged that Father additionally violated the agreed temporary order by renting an apartment even though the order required him to continue residing with his mother.

¶ 20    At the scheduled hearing on September 27, 2024, the parties agreed to modify the temporary order. Pursuant to their agreement, each party was permitted to request that the other party submit to a hair follicle drug test once every 60 days. Each party was required to submit to the requested test within 72 hours. If either party tested positive, that party's parenting time would be suspended. The parties further agreed to strike the petitions for contempt and adjudication of abuse of parenting time.

¶ 21    The matter was set for a final hearing on February 28, 2025. However, the final hearing was continued by agreement of the parties.

¶ 22    On May 28, 2025, the GAL filed a supplemental report. He noted that at that time, Father had maintained his sobriety for approximately four or five years, while Mother had remained sober for nearly one year. He opined that both parties needed support due to their struggles with addiction, but he noted that both had strong support networks. The GAL reported that Mother's former caseworker, Angel Wilson, told him she believed Mother would start using drugs again once all parenting time restrictions were lifted. However, she did not provide any information to support her opinion. The GAL recommended allocating parenting time equally between the parties and lifting the restrictions on Mother's parenting time. He did not address decision-making responsibilities.

¶ 23    On June 20, 2025, the trial court once again modified the agreed temporary order. As modified, the order allowed Mother to have unsupervised parenting time. The trial court further provided that if either party suspected the other of using drugs or alcohol, they could demand that the other party submit to a drug test within seven days.

6

¶ 24    In August 2025, the trial court set the matter for a final hearing on October 8, 2025. However, on October 2, 2025, Father's attorney filed a motion to withdraw as counsel to address the medical needs of his immediate family. On October 8, 2025, the trial court held a hearing on counsel's motion rather than a final hearing on the merits. Counsel was allowed to withdraw without objection, and Father was given 21 days to have new counsel enter an appearance on his behalf.

¶ 25    At a November 3, 2025, status hearing, Father appeared *pro se* and requested additional time to retain counsel. The trial court granted his request and set the matter for December 8, 2025, "for Appearance of Counsel."

¶ 26    On December 5, 2025, Father filed a *pro se* petition for rule to show cause. He alleged that Mother violated the agreed temporary order by taking Paisley out of Macon County on two different occasions in October of 2025.

¶ 27    Father again appeared *pro se* at the December 8, 2025, hearing. At Mother's request, the case was set for a final hearing on January 30, 2026. Although the record does not contain a transcript or bystander's report of this hearing, there is no indication in the trial court's docket sheet that Father objected to this setting or requested additional time to retain counsel.

¶ 28    On January 30, 2026, the matter came for a hearing on the petition to allocate parental responsibilities, as scheduled. Father appeared *pro se*. At the outset, the court asked Father if he was ready to proceed. The following exchange occurred:

> "PETITIONER WILLIAMS: No, sir. We was [*sic*] supposed to have court I believe Monday on a Petition for Contempt, and I wasn't—I'm not sure how this works. This is my first time ever dealing with something like this. And I figured—I thought the

7

Petition for Contempt would reflect on what's taken for the hearing today so that's the reason I was hoping this was going to be continued.

THE COURT: Well—

PETITIONER WILLIAMS: I don't have any witnesses to—that was part of the matter for contempt or for the hearing today.

THE COURT: Mr. Williams, this has been pending for almost five years, you know. You've had multiple attorneys involved in this case. This case needs to be resolved. It's set for hearing today so I'll show there's a motion to continue, but I'll show that the motion is denied."

¶ 29 Father's first witness was Mother's mother, Janene Greer. Greer testified that Mother had four children and acknowledged that DCFS was "involved" in Mother's life. Her oldest child, Tristan, was 15 years old. When Tristan was "probably three or four" years old, Greer supervised Mother's parenting time with him; however, that restriction no longer applied.

¶ 30 Greer testified that DCFS became involved with Mother's second child, Kyler, because "he had some drugs in his system" when he was born. Mother subsequently relinquished her parental rights to Kyler and allowed him to be adopted by a family of her choice.

¶ 31 Greer testified that DCFS likewise became involved with Mother's third and fourth children at birth.[1] She explained that with her third child, Mother was given ephedrine, which mimicked drugs in the baby's system. She acknowledged, however, that the fourth child was born with drugs in her system.

---

[1]Mother's third child is Paisley, the child at issue in this appeal.

¶ 32    Father asked Greer if "the sheriffs" ever came to her home to pick up Paisley. She replied, "They did but they shouldn't have." She explained that Mother brought Paisley to her home because she was worried about the child after a fight took place between Mother and Father.

¶ 33    Father questioned Greer about taking Paisley out of town despite a court order that "says to reside in Macon County." Greer acknowledged that she took Paisley to a pumpkin patch outside of Macon County on one occasion and that she took her to visit her brother for his birthday on another occasion. She stated, however, that she did not know the order requiring parenting time to take place within Macon County was still in effect at that time. She explained, "I thought the court order ended when [Mother] got unsupervised visits."

¶ 34    Greer acknowledged that Mother previously used drugs, but she testified that Mother "cleaned up and she's been clean for over a year-and-a-half."

¶ 35    On cross-examination, Greer testified that Father and Mother used drugs together. Asked about her observations of Mother's parenting over the 19 to 20 months before the hearing, Greer testified that Mother doted on her children and had not done anything to endanger them. Greer had no concerns with Mother's parenting ability.

¶ 36    Greer testified about an incident that occurred after Mother bought a used car. Greer noted that Mother was "real proud" of the car. Mother picked up Father and gave him a ride to run an errand because he does not drive. According to Greer, Father cut the fabric on the passenger seat of Mother's car with his pocketknife, and claimed the knife slipped.

¶ 37    Greer also testified about the incident in which Mother brought Paisley to Greer's home after a fight with Father. Greer explained that Mother and Father went to Walmart that night to buy groceries. While they were shopping, Mother was unable to find Father, so she returned to her car with Paisley to wait for him. Father was angry when he returned to the car. During the drive

9

home, he screamed at Mother to stop the car. She stopped, and he got out. According to Greer, Father told Mother he was going to get Paisley out of the vehicle, walk back to Walmart with her, and call someone else for a ride home. Mother feared this was not safe for Paisley because it was cold and dark outside. She therefore drove away without Father and brought Paisley to Greer's house. Father called the police, claiming that Mother had kidnapped Paisley, and the police came to the door and took Paisley away.

¶ 38    Testifying on his own behalf, Father stated that he had been making all the decisions for Paisley since she was returned to his care after the juvenile court case closed. He noted that he was involved in the juvenile court case only because he was Paisley's father, not because he did anything wrong. He further noted that DCFS was not involved with any of his other children. He further testified that he had never failed a drug test or put his daughter in any danger.

¶ 39    Father stated that he would agree to an equal division of parenting time if Mother kept Paisley away from an individual named Christopher Wright, who Father described as "a known drug dealer and a person that's not in recovery." He testified, however, that Wright had been to Mother's house recently.

¶ 40    Next, Father testified about a recent incident when he had dinner with Mother at a Mexican restaurant. According to Father, Mother had a drink during dinner and then stopped at a liquor store on the way home to buy more alcohol.

¶ 41    Father called Brian Finney as a witness. Finney served as the GAL in Macon County case No. 21-JA-178, the juvenile court case involving Paisley. However, Finney was unable to recall any pertinent details concerning that case. At Father's request, the trial court took judicial notice of portions of the record in Macon County case No. 21-JA-178. Specifically, the court took notice of the court orders and reports of proceedings in that case.

¶ 42    Mother's first witness was Corrina Hosto, a foster care caseworker at Webster-Cantrell Youth Advocacy. Hosto served as the caseworker for Mother and her youngest daughter, Presley, from July 2024 to April 2025. Although she was not Paisley's caseworker, Hosto had contact with Father because Mother initially identified him as a possible father of Presley.

¶ 43    Hosto testified that Presley came into care due to Mother's drug use. She indicated that Mother successfully completed all required services. Presley was returned to Mother's care in October 2024, and the case was subsequently closed. Hosto had no concerns about Mother's parenting ability going forward. She described Mother as "a very good mother."

¶ 44    Hosto was asked if she had observed any concerning behavior by Father. She testified to two incidents. The first incident occurred when Hosto arrived at court for an unrelated case. Father's mother was sitting in her truck in the parking lot and talking on her phone. She stared at Hosto as she walked toward the court. Father exited the building, talking on his phone, and walked toward Hosto's car. The second incident occurred when Hosto was supervising a transfer of custody. He yelled, "I will be seeing you and your kids in Taylorville." Hosto interpreted this as a threat. She explained that she and her children lived in Taylorville, and she did not know how Father knew this.

¶ 45    On cross-examination, Father asked about Hosto's observations of Father's conduct during child visits.[2] Hosto testified that although she did not personally observe visits, the worker who supervised visits reported "nothing negative" about Father's interactions with the child.

¶ 46    Mother testified that she lived in her own home with her youngest daughter. She indicated that she had three children—15-year-old Tristan, 4-year-old Paisley, and 1-year-old Presley.

---

[2]Hosto was not asked to clarify if these were visits with Presley, Paisley, or both.

¶ 47    Mother worked as a nurse at Imboden Creek Nursing Home. She had been a licensed nurse for 15 years. Approximately six months before the hearing, Mother learned that someone had made a complaint to the nursing board alleging that she had recently used methamphetamine. Mother obtained a copy of that complaint. She opined that the language used in the complaint was identical to the language Father used during the proceedings in this case. The investigator from the Department of Professional Regulation who handled the complaint ultimately dismissed it.

¶ 48    Mother testified that the last time she used drugs was June 2024. She identified Respondent's Exhibit 1, which was later entered into evidence, as the results from drug tests she submitted to in July 2025 and January 2026. Both tests were negative for any substances. Mother noted that she took other drug tests as well, all of which came back negative. She explained that she took drug tests even without a court order because Father "constantly" accused her of using drugs and of having drug dealers and users around her children. Asked how frequently Father made these accusations, she replied, "[I]t's gotten lesser [*sic*] over time, but I would probably say once a week."

¶ 49    Mother testified that Paisley attended preschool four days a week. She testified about multiple incidents that occurred while she was dropping Paisley off at school or picking her up. She stated that there was a 30-day period during which Father and his mother were in the preschool's parking lot each time Mother was there for drop-off or pick-up. Father often followed Mother and yelled at her. On one occasion, when Mother and Greer were picking up Paisley, Father's mother pulled her vehicle behind theirs, blocking them into their parking space. Mother described another incident in which Father took Paisley's book bag off her back and then reached into the car and took off Paisley's shoes while Mother was putting her in the car. According to

12

Mother, Father then yelled at her that she needed to buy a book bag and shoes for Paisley. Mother emphasized that these incidents occurred during her parenting time.

¶ 50   According to Mother, Father asked her not to come to the special programs Paisley's school had for Thanksgiving and Christmas. She could not recall whether the functions were scheduled during her parenting time or his.

¶ 51   Mother testified that Father also told her she was not welcome to attend Paisley's doctor appointments. She noted that he usually informed her of appointments either during or after the appointment.

¶ 52   Next, Mother testified that Father refused to allow her to exercise any of her parenting time with Paisley for a period of 14 months in spite of the court's temporary order. She noted that he sometimes allowed her to visit with Paisley in his apartment, but even that was not consistent. Mother stated that the situation was resolved after she filed a petition alleging abuse of parenting time.

¶ 53   In addition, Mother testified that Father limited her ability to talk to Paisley on the phone during his parenting time. She explained that he told her she may only call at exactly 8 p.m. When she tried to call at that time, however, Father often told her that Paisley was sleeping or attending a Narcotics Anonymous (NA) meeting with him.

¶ 54   Mother acknowledged that she was an addict in the past. She stated that she and Father used drugs together at times. Although Mother did not find NA helpful and no longer attended meetings, she had other options available to her for support, such as Celebrate Recovery and Crossings.

¶ 55   Mother did not believe it was possible to communicate with Father concerning Paisley. She feared that if he were given sole decision-making authority, his pattern of interference would

continue until Paisley was an adult. Mother testified that if she were allocated sole decision-making responsibilities, she would be willing to provide Father with information about Paisley's medical records, schooling, and insurance, something he had not been willing to do for her.

¶ 56    On cross-examination, Mother testified that she never went to Paisley's preschool during Father's parenting time except for "school functions for parties and field trips." She acknowledged, however, that she went there once the previous week to meet with Paisley's teacher and get copies of papers for the hearing.

¶ 57    Mother acknowledged that she had a drink when she went out to dinner with Father two weeks earlier. However, she denied stopping at the liquor store afterward.

¶ 58    Mother testified that Father had been in her house. He then asked, "For somebody that you would say is dictating everything, why would you have me around? Why would you allow me to come to your house?" Mother replied, "We do things together with the children."

¶ 59    Father questioned Mother about Christopher Wright. She stated, "He is somebody that we both have been associated with at times." She testified that he recently relapsed into drug use, and she cut off contact with him as a result. Asked if Wright had been to her house, Mother indicated that he picked his daughter up there about one year earlier.

¶ 60    The matter was continued until February 3, 2026, due to time constraints. Before adjourning, the trial court stated, "I'd like the record to reflect that [Father] reported that he was not prepared for trial, but he has a whole table full of documents with him. He also appeared with a bunch of witnesses."

¶ 61    When the hearing resumed on February 3, 2026, Father continued his cross-examination of Mother. She testified that her first contact with DCFS involved her oldest child. She stated that she followed the service plan, and the case closed in six months. Mother testified that she followed

14

the service plan for her second child as well, but "Covid hit and I didn't see him for over six months and everything closed down." Mother acknowledged that Paisley tested positive for drugs in her urine at birth. Mother explained, however, that this was because she was given ephedrine during labor. She noted that her own drug tests before going into labor and immediately after giving birth were negative.

¶ 62    Mother acknowledged that she had a glass of wine at Christmas, and she again acknowledged that she had a drink at a dinner two or three weeks before the hearing. Mother testified that her children were with her both times, and she drove home with them after having one drink at the recent dinner. Mother acknowledged that alcohol is considered a drug. However, she did not believe that having one drink constituted a "relapse."

¶ 63    Mother agreed that Father had provided Paisley with a safe home. However, she noted that she had concerns about his "parenting style." She was not asked to elaborate.

¶ 64    At Father's request, the trial court took judicial notice of the orders and docket entries in Macon County case No. 24-JA-109, the juvenile court case involving Mother's youngest child, Presley, and in Macon County case No. 23-OP-684. Regarding No. 23-OP-684, the court noted that the request was denied and the emergency order of protection was dismissed.

¶ 65    On redirect examination, Mother testified that Father also smoked and injected methamphetamine, and that he, too, required treatment for addiction. She stated that Father was arrested on drug charges and sentenced to drug court, but was subsequently discharged from drug court. Mother thought he was discharged approximately a year earlier, but she was not certain. Mother further testified that Father did not drive because he did not have the equipment required of him due to prior charges for driving under the influence.

15

¶ 66    Counsel asked Mother about the drink she had at a restaurant a few weeks before the hearing. Mother stated that she had a margarita and that she was not intoxicated when she drove home. She testified that, at the time, Father did not accuse her of being intoxicated or raise any objections to her having a drink. She further testified that she did not have an alcohol abuse problem.

¶ 67    Next, Mother described an incident that occurred over the weekend between the two days of the hearing. Father came to her house that Sunday to pick up Paisley for his parenting time. According to Mother, he refused to come to the door. Instead, he texted Mother, telling her to send Paisley out in the snow to his car. Mother explained that this was not the usual protocol. Ordinarily, Father came into the house, and they discussed matters related to the child.

¶ 68    After hearing arguments, the trial court took the matter under advisement. The court noted that further proceedings would be necessary to address Father's petition for rule to show cause and the issue of child support.[3]

¶ 69    On February 6, 2026, the trial court entered a written allocation judgment. The court expressly found that all witnesses were credible except for Father, explaining that Father's testimony was "ingenuine at times, shaded to present himself in a favorable light while denigrating [Mother's] conduct."

¶ 70    After setting forth the statutory factors, the trial court made the following findings regarding the allocation of decision-making responsibilities. The court first found that both parties were loving parents who were concerned with the well-being of their child. The court found that the parties had been "in constant conflict" throughout the proceedings and were unable to agree

---

[3]The petition for rule to show cause was eventually dismissed for want of prosecution. Neither that ruling nor the question of child support are at issue in this appeal.

on issues or cooperate to the degree necessary to have joint decision-making responsibility. The court noted that Father had been the primary custodian and caregiver for the last 24 months due to Mother's substance abuse issues. However, since that time, Mother engaged in substance abuse treatment and complied with the services required of her by DCFS.

¶ 71 The court further found that both parties were capable of making decisions for the child, and that both had support from their families. The court noted that the child was too young to express her wishes with regard to the allocation of parental responsibilities.

¶ 72 The court found that both parties had a history of substance abuse. Father had been clean for five years, while Mother had been clean for one year. The court noted that Mother's caseworker had no concerns with her parenting and described her as a good parent.

¶ 73 Significantly, the court found that Father engaged in a pattern of behavior that interfered with Mother's parenting time. The court highlighted evidence that Father interfered with Mother's parenting time when she picked the child up from school every day for a month, requested that Mother not attend a holiday program at the school, told Mother she was not welcome at doctor appointments, and refused for 14 months to allow Mother to see the child except at his apartment. The court explained that this conduct "demonstrates that he lacks the willingness and/or ability to facilitate and encourage" Mother's relationship with the child. See 750 ILCS 5/602.5(c)(11) (West 2024). The court found that this factor "strongly favors" an allocation of decision-making responsibilities to Mother "to prevent [Father] from using his authority to exclude [Mother] from the child's life." In conclusion, the court found that it was in the best interest of the child to allocate sole decision-making responsibilities to Mother in the areas of education, health, and extracurricular activities, and joint decision-making responsibility to both parties in the area of religion.

17

¶ 74     Turning its attention to the allocation of parenting time, the trial court set forth the statutory factors. After noting that it had considered these factors, the court reiterated its findings "concerning allocation of parental responsibilities as they relate to parenting time." The court also considered the GAL's recommendation of equal parenting time to be significant. The court allocated parenting time equally between the parties. An attached parenting plan includes a schedule dividing parenting time between the parties over a two-week cycle. This timely appeal followed.

¶ 75                                        II. ANALYSIS

¶ 76     We first note that Mother has not filed a brief in this matter. However, we may decide the merits of Father's appeal because the record is relatively simple and we are able to consider the issues presented for review without the aid of an appellee's brief. See *First Capitol Mortgage Corp. v. Talandis Construction Corp.*, 63 Ill. 2d 128, 133 (1976).

¶ 77     On appeal, Father argues that the trial court erred in (1) denying his request for a continuance; (2) allocating sole decision-making responsibilities to Mother in the areas of education, health, and extracurricular activities; and (3) allocating parenting time equally between the parties. We reject these contentions.

¶ 78                          A. Request for a Continuance

¶ 79     Father's first argument concerns the trial court's decision not to grant him a continuance. We first note that Father did not file a written motion seeking a continuance, and he did not even expressly request a continuance at the hearing. As discussed earlier, he indicated that he "was hoping this was going to be continued." A trial court does not err in failing to grant a request for a continuance when no such request is made. See *In re K.L.*, 2022 IL App (4th) 220067-U, ¶ 55.

18

Nevertheless, the trial court treated Father's statement as an oral motion for a continuance. Father argues that the court abused its discretion in denying that motion. We disagree.

¶ 80 A party does not have the absolute right to a continuance. *In re Marriage of LaRocque*, 2018 IL App (2d) 160973, ¶ 94. Whether to grant a request for a continuance is a matter within the discretion of the trial court. *In re Marriage of Chesrow*, 255 Ill. App. 3d 613, 617 (1994). In this case, Father did not request a continuance before the matter came for a final hearing. Illinois Supreme Court Rule 231(f) places limits on motions for continuances made after the case has reached trial, providing that such motions shall not be heard, "unless a sufficient cause is shown for the delay." Ill. S. Ct. R. 231(f) (eff. Jan. 1, 1970). Thus, a party requesting a continuance once the matter comes for trial must demonstrate "especially grave reasons" for the continuance due to the potential inconvenience to other parties, witnesses, and the court. *Chesrow*, 255 Ill. App. 3d at 618. In matters involving child custody and the allocation of parental responsibilities, proceedings must be held "on an expedited basis." Ill. S. Ct. R. 901(a) (eff. Oct. 1, 2021). In accordance with the need to determine such issues in a timely fashion, continuances may not be granted "except for good cause shown" and may only be granted "if the continuance is consistent with the health, safety[,] and best interests of the child." Ill. S. Ct. R. 901(c) (eff. Oct. 1, 2021).

¶ 81 On appeal, we review the trial court's decision to grant or deny a motion for a continuance for an abuse of discretion. *LaRocque*, 2018 IL App (2d) 160973, ¶ 94; *Chesrow*, 255 Ill. App. 3d at 618. A decisive factor in determining whether the trial court properly exercised its discretion is whether the party requesting the continuance demonstrated a lack of due diligence. *Chesrow*, 255 Ill. App. 3d at 618. We will find an abuse of discretion only if the trial court's decision is arbitrary, fanciful, or unreasonable, or if no reasonable person would reach the same conclusion. *LaRocque*,

2018 IL App (2d) 160973, ¶ 94. In addition, reversal is not warranted unless the party challenging the ruling was prejudiced as a result. *In re A.F.*, 2012 IL App (2d) 111079, ¶ 36.

¶ 82     Here, Father did not demonstrate an especially grave reason for requesting a continuance after the matter reached the trial stage, nor did he demonstrate due diligence in making the request. Father's attorney was allowed to withdraw as counsel in October 2025, more than three months before the matter came for a final hearing at the end of January 2026. The court initially continued the matter for three weeks to allow Father to retain new counsel, setting a hearing for new counsel to enter an appearance on November 3, 2025. Father appeared *pro se* at the November 3 hearing and asked for an additional continuance to afford him more time to find new counsel. The trial court granted his request and reset the hearing for December 8, 2025, more than a month later. Father again appeared *pro se* at the December 8 hearing. There is no indication in the record that he requested any additional continuances until the matter came for a final hearing nearly two months later, despite ample opportunity to do so. Thus, he did not demonstrate due diligence.

¶ 83     In addition, although Father indicated that he was not ready to proceed with the hearing due to his belief that the court was going to hear his motion for rule to show cause before proceeding to the merits, the record reveals that he came prepared with witnesses to call and what the trial court described as a "whole table full of documents" to guide his questions. He thus failed to establish the type of "especially grave reasons" a party must demonstrate when seeking a continuance once a case reaches the trial stage.

¶ 84     Moreover, despite the expediency required in child custody matters, the case had been pending for over four years. We acknowledge that not all the delays were attributable to Father. Both parties had to retain new counsel more than once after their respective attorneys withdrew as counsel, and the matter was continued by agreement many additional times. Nevertheless, given

our supreme court's directive to expedite child custody proceedings, the trial court correctly considered the extensive time this case was pending in deciding to deny Father a continuance.

¶ 85 In support of his claim to the contrary, Father relies heavily on *People v. Walker*, 232 Ill. 2d 113 (2009). We find his reliance on *Walker* misplaced.

¶ 86 There, a criminal defendant argued on appeal that the trial court abused its discretion in denying his request for a continuance "where defense counsel admitted she was unprepared to try defendant's double-murder case." *Id.* at 123. In addressing this claim, the Illinois Supreme Court first noted that generally, the decision to grant or deny a request for a continuance is a matter within the discretion of the trial court. *Id.* at 125. The supreme court went on to explain, however, that a criminal conviction must be reversed when the denial of a continuance impacts the defendant's ability to prepare a defense, thereby prejudicing his rights. *Id.* The supreme court stated that pertinent factors to consider in ruling on a criminal defendant's request for a continuance include: the moving party's diligence, the defendant's speedy trial rights, the defendant's right to a fair and impartial trial, the interests of justice, whether defense counsel was unable to prepare for trial due to commitments in another case, the history of the case, the seriousness of the charges the defendant is facing, docket management, judicial economy, and the potential inconvenience to witnesses and parties. *Id.* at 125-26.

¶ 87 The supreme court held that the trial court in *Walker* failed to exercise its discretion where there was no indication in the record that it considered any of these factors. *Id.* at 126. Specifically, the supreme court observed that, in its ruling, the trial court did not comment on the interest of justice, the severity of the charges, the complexity of the case, docket management, judicial economy, or the potential inconvenience to witnesses. *Id.* at 127. In addition, the trial court failed to ask defense counsel how much time she would need. *Id.*

¶ 88     In likening this case to *Walker*, Father argues that here, too, the trial court failed to discuss the interest of justice, the complexity of the case, the need to manage its docket, judicial economy, or the potential inconvenience to witnesses, and failed to ask Father how long a continuance he needed. We find this argument unpersuasive. In *Walker*, the supreme court was concerned with the potential denial of "the substantive right of the accused to properly defend" against extremely serious criminal charges. (Internal quotation marks omitted.) *Id.* at 125. Indeed, as stated previously, the *Walker* court specifically stated that the factors it identified were relevant considerations when ruling on a criminal defendant's request for a continuance. *Id.* The same concerns were not implicated here. At issue in this case was the allocation of parenting time and decision-making responsibilities between two fit parents; Father was not facing serious criminal charges or the potential loss of his parental rights. The trial court did not have to weigh considerations such as judicial economy, convenience, or the need for an expeditious ruling in a child custody case against the need to protect important substantive rights. We find no support for Father's position in *Walker*. For the reasons previously discussed, we find no abuse of discretion in the trial court's decision not to grant Father a continuance.

¶ 89          B. Parental Responsibilities for Significant Decision-Making

¶ 90     Father next contends that the trial court's allocation of sole decision-making responsibilities to Mother in most areas was against the manifest weight of the evidence. We disagree.

¶ 91     Trial courts must allocate decision-making responsibilities in accordance with the best interests of the child. 750 ILCS 5/602.5(a) (West 2024). The court must consider "all relevant factors" in determining the child's best interests, including: (1) the wishes of the child, taking into account the child's maturity and ability to express a preference; (2) the child's adjustment to home,

22

school, and community; (3) the mental and physical health of all individuals involved; (4) the ability of the parents to cooperate in decision-making or the level of conflict between them that might affect their ability to make decisions jointly; (5) each parent's prior decision-making for the child; (6) any prior agreement or course of conduct between the parties related to decision-making for the child; (7) the wishes of the parents; (8) the needs of the child; (9) the distance between the parents' residences; (10) whether a restriction on decision-making is appropriate; (11) the willingness and ability of each parent to facilitate and encourage the other parent's relationship with the child; (12) any physical violence or threat of violence against the child by a parent; (13) any incidents of abuse of the child or other members of the child's household; (14) whether either of the parents is a sex offender; and (15) any other factor the trial court expressly finds relevant. *Id.* § 602.5(c). The trial court is not required to make express findings related to each statutory factor. *In re Marriage of McLean*, 2025 IL App (5th) 250094, ¶ 73.

¶ 92    On appeal, "there is a strong and compelling presumption in favor of the result reached by the trial court." (Internal quotation marks omitted.) *Id.* This is because we recognize that the trial court was in the best position to evaluate the evidence and determine the child's best interests. *Id.* As such, we will not reverse the trial court's allocation of decision-making responsibilities unless its decision is against the manifest weight of the evidence. *Id.* ¶ 72. A decision is against the manifest weight of the evidence if the opposite conclusion is apparent or if the trial court's findings are unreasonable, arbitrary, or not based on the evidence. *Id.*

¶ 93    Here, the trial court expressly found that the animosity between the parties significantly impeded their ability to cooperate to the degree necessary to share in decision-making for their child. See 750 ILCS 5/602.5(c)(4) (West 2024). The evidence supports this finding. Although we note that there was no evidence that the parties had any particular disagreements regarding

23

Paisley's schooling or medical care, there was no evidence that they discussed these decisions, and there was substantial evidence of their animosity toward each other. Father argues, however, that the trial court "completely overlooked" evidence that "some of [Father's] actions occurred during a time when Mother was in active addiction." We find this argument unpersuasive for two reasons.

¶ 94 First, there was clear evidence that Father's concerning conduct continued during the time when Mother was indisputably abstaining from drug use. For example, Mother testified that Father continued to exclude her from Paisley's medical appointments and continued to impede her ability to communicate with Paisley while she was in his care. Second, Father does not argue that the parties were capable of cooperating; instead, he argues that he, rather than Mother, should have been given sole responsibilities for decision-making. We find that the evidence supports the trial court's finding that the parties' animosity precluded them from cooperating in joint decision-making.

¶ 95 In determining how to allocate sole decision-making responsibilities, the factor the trial court weighed most heavily in this case was the willingness and ability of each party to facilitate and encourage the other parent's relationship with the child. See 750 ILCS 5/602.5(c)(11) (West 2024). Undisputed evidence showed that Father repeatedly denied Mother parenting time in violation of court orders, excluded Mother from participation in Paisley's medical care, harassed Mother when she picked Paisley up from school, and demanded that Mother not attend school functions. In finding that Father was unwilling or unable to foster and encourage Mother's relationship with Paisley, the trial court highlighted specific examples of his conduct from the testimony presented. See *McLean*, 2025 IL App (5th) 250094, ¶ 75 (noting with approval that the trial court cited specific examples in addressing each factor).

¶ 96     Father argues, however, that the conduct highlighted by the court was simply "protective behavior[ ]" meant to shield Paisley "from exposure to [Mother's] drug abuse." We reject this characterization. We note that the evidence is somewhat unclear regarding the extent of Mother's drug use prior to June 2024. She characterized her drug use at that time as a "relapse," but she did not offer any specific evidence as to how long she was clean before relapsing. However, undisputed evidence shows that she remained clean from July 2024 onward. As we have just discussed, there is no evidence that Father's interference in Mother's relationship with Paisley stopped after that time. In addition, refusal to comply with court-ordered *supervised* parenting time for over a year cannot be characterized as a mere attempt to shield a child from her mother's drug use. The record contains ample evidence to support the trial court's finding that Father was unwilling or unable to facilitate Mother's relationship with Paisley.

¶ 97     Father argues that the mental and physical health of all individuals involved (750 ILCS 5/602.5(c)(3) (West 2024)) was "a crucial factor" that the court should have weighed in favor of allocating decision-making responsibilities to him. In particular, he contends that as a "newly sober" parent who still consumed alcohol, Mother should not have been "granted sole decision-making authority for a toddler." We disagree. The trial court considered the fact that both parents were recovering addicts, including the fact that Father had maintained his sobriety for a period of five years. In addition, the court found that both had support from their families in helping them to overcome their addictions. By the time this matter came for a final hearing, Mother had maintained her sobriety for over 18 months. Although not addressed by the trial court, we do not believe evidence that Mother had a single drink on two occasions contradicts the trial court's express finding that both parents were capable of making decisions for their child.

¶ 98    Father contends that two additional factors should have weighed heavily in his favor—the child's adjustment to her home, school, and community (*id.* § 602.5(c)(2)) and each parent's past participation in significant decision-making (*id.* § 602.5(c)(5)). With respect to the child's adjustment to her home, school, and community, we note that the parties resided in the same community, Paisley already spent time in both of their homes, and there was no evidence that Mother intended to enroll Paisley in a different school. We find that this factor is neutral. As to the parties' past participation in significant decision-making, the trial court expressly considered this factor and recognized that Father previously made all significant decisions for Paisley. While we agree that this factor weighs in favor of allocating continued responsibilities for decision-making to Father, we do not believe the factor is dispositive.

¶ 99    Overall, we believe the evidence supports the trial court's decision. "It is no small burden to show that a trial court's allocation of decision-making responsibilities is against the manifest weight of the evidence." *McLean*, 2025 IL App (5th) 250094, ¶ 82. In this case, Father is unable to meet that burden.

¶ 100                               C. Parenting Time

¶ 101   Father's final argument is that the trial court's allocation of parenting time was against the manifest weight of the evidence. We disagree.

¶ 102   Parenting time must be allocated in accordance with the best interests of the child. 750 ILCS 5/602.7(a) (West 2024). In determining the best interests of the child, trial courts must consider all relevant factors, including: (1) the wishes of each parent; (2) the wishes of the child, taking into account the child's maturity and ability to express a preference; (3) the amount of time each parent spent on caretaking functions for the child in the two years before the petition requesting an allocation of parenting time was filed; (4) any prior agreement or course of conduct

26

between the parents; (5) the child's relationship and interaction with parents, siblings, and any other individuals who might significantly affect the child's best interests; (6) the child's adjustment to home, school, and community; (7) the mental and physical health of all the individuals involved; (8) the needs of the child; (9) the distance between the parties' residences, the cost and difficulty of transporting the child, the daily schedules of the child and the parents, and the parents' ability to cooperate; (10) whether a restriction on parenting time is appropriate; (11) any physical violence or threat of violence; (12) the willingness and ability of each parent to place the child's needs ahead of their own needs; (13) the willingness and ability of each parent to facilitate and encourage the relationship between the child and the other parent; (14) any abuse against the child or any member of the household; (15) whether either of the parents is a convicted sex offender or lives with a convicted sex offender; (16) the terms of a parent's military family-care plan if the parent is a military member who is being deployed; and (17) any other factor the trial court expressly finds relevant. *Id.* § 602.7(b). Although the trial court must consider all applicable factors, it need not make explicit findings or references to each factor. *In re Custody of G.L.*, 2017 IL App (1st) 163171, ¶ 43.

¶ 103   The trial court is "in the best position to assess the credibility of witnesses and determine the child's best interest" and to observe the temperaments and personalities of the parties. *In re Marriage of Whitehead*, 2018 IL App (5th) 170380, ¶¶ 15, 21. As such, we accord great deference to its decision regarding parenting time. *Id.* ¶ 15. We will not reverse the trial court's allocation of parenting time unless it is against the manifest weight of the evidence, manifestly unjust, or the result of an abuse of discretion. *McLean*, 2025 IL App (5th) 250094, ¶ 86; *G.L.*, 2017 IL App (1st) 163171, ¶ 24.

27

¶ 104   Father contends that several of the statutory best-interest factors favored an allocation of the majority of parenting time to him. He first addresses the amount of time each parent previously spent on caretaking functions for the child (750 ILCS 5/602.7(b)(3) (West 2024)). Father correctly points out that he was Paisley's primary caregiver for most of her life, something the trial court recognized. He contends that there was "no justification" for changing the parenting time schedule from one in which Mother had two to three overnights per week with the child to one involving an equal allocation. We disagree.

¶ 105   As Father acknowledges, the child was already spending two to three nights per week with Mother. The parenting schedule in the agreed temporary order allocated parenting time based on a two-week schedule. In the first week, Mother had parenting time for three nights, and in the second week, she had parenting time for two nights. This gave her roughly 35% of the parenting time (5 divided by 14 equals 0.35). Increasing Mother's parenting time to 50% did not represent a destabilizing disruption in Paisley's life.

¶ 106   Moreover, the change was consistent with the recommendations of the GAL. In his initial report, the GAL recommended that Father remain the primary caregiver, but he recommended that Mother's parenting time be increased as she completed substance abuse treatment and maintained her sobriety. In his supplemental report, the GAL recommended an equal allocation of parenting time.

¶ 107   Father further contends that the trial court "downplayed significantly" the importance of the mental and physical health of the individuals involved. See *id.* § 602.7(b)(7). He emphasizes Mother's history of drug use. Similarly, Father complains that the trial court did not address the willingness and ability of each parent to place the child's needs ahead of his or her own needs (*id.* § 602.7(b)(12)), a factor he contends favors allocating the majority of parenting time to him. He

28

again cites Mother's history of substance abuse as evidence that she is unwilling or unable to put Paisley's needs first. We reject both of these contentions for the same reason. As discussed previously, the evidence established that both parties had a history of substance abuse and that, by the time of the hearing, Mother had maintained her sobriety for 18 months and Father had maintained his sobriety for several years. We do not believe either of these factors required a result other than the one reached by the trial court. Viewing the evidence as a whole as it relates to parenting time, we find that the trial court's decision to allocate parenting time equally was not against the manifest weight of the evidence.

¶ 108                                    III. CONCLUSION

¶ 109   For the foregoing reasons, we affirm the trial court's judgment.


¶ 110   Affirmed.